IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

JEFFREY LIGGINS,

Plaintiff,

v.                                                    Civil Action No.
                                                      9:04-CV-0966 (NAM/DEP)

DOUGLAS PARKER, *et al.*,

Defendants.

---

APPEARANCES:                                  OF COUNSEL:

FOR PLAINTIFF:

JEFFREY LIGGINS, *Pro Se*

FOR DEFENDANTS:

RYAN, SMALLACOMBE LAW FIRM        CLAUDIA A. RYAN, ESQ.
100 State St.                     JOHN F. MOORE, ESQ.
Suite 800
Abany, NY 12207

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff Jeffrey Liggins, who is proceeding *pro se* and *in forma pauperis*, has commenced this inmate civil rights action pursuant to 42 U.S.C. § 1983 against Hamilton County and the County's Sheriff, as well

as certain other County employees, complaining of conditions which he endured while confined as a pretrial detainee in the Hamilton County Jail ("HCJ").  Plaintiff's complaint represents a comprehensive, wide-ranging critique of the operations of the defendants' prison facility, with his allegations ranging in severity from the failure of prison guards to wear name tags, tuck in their shirts, lace and polish their shoes, and refrain from the use of foul language and boorish behavior, to defendants' failure to provide him with adequate medical care and interference with his access to the attorneys representing him and the courts.  In light of the treatment which he received over the nine month period during which he was incarcerated at the HCJ, described by him as "inhumane", plaintiff seeks recovery of compensatory and punitive damages totaling $6 million.

Currently pending before the court is a motion made on behalf of the defendants in the action seeking the entry of summary judgment dismissing plaintiff's complaint in its entirety, both on the merits and based upon qualified immunity.  For the reasons set forth below, I recommend that defendants' motion be granted.

I.      BACKGROUND

      A.      The HCJ Generally

2

Between June 27, 2002 and April 1, 2003, plaintiff was confined within the HCJ as a result of criminal charges originating in the Town of Lake Pleasant, New York located within Hamilton County.  Amended Complaint (Dkt. No. 12) ¶ 18; Parker Aff. (Dkt. No. 33-3) ¶ 4; *see also* Defendants' Exhibits (Dkt. No. 35) Exh. 21.  The HCJ is a six-cell prison facility located in Lake Pleasant, and comprised of four cells on the facility's main floor and two upstairs, with an additional group room located outside of the cells, containing an eating area, a television, and a table. Parker Aff. (Dkt. No. 33-3) ¶¶ 8-9; Defendants' Exhibits (Dkt. No. 35) Exh. 16-A.  The HCJ typically houses and co-mingles both sentenced and non-sentenced inmates.

Inmates confined within the HCJ are subject to rules and regulations which are reduced to writing and included in a prison rule book.  Amended Complaint (Dkt. No. 12) ¶ 23; Parker Aff. (Dkt. No. 33-3) ¶ 10; Defendants' Exhibits (Dkt. No. 34) Exh. 10-A.  The facility's rules and regulations were read to the plaintiff on the day of his arrival at the facility by Corrections Officer Robert Krugal, who is named in plaintiff's complaint as defendant "Robe Doe", and plaintiff signed a document acknowledging that this in fact occurred.  Parker Aff. (Dkt. No. 33-3) ¶¶ 10-12; Defendants' Exhibits

(Dkt. Nos. 34-35) Exhs. 10-A, 24; *see also* Amended Complaint (Dkt. No. 12) ¶ 23.  Included among the policies and procedures in existence at the HCJ is a grievance book to which all inmates within the facility have access.[1,2]  Parker Aff. (Dkt. No. 33-3) ¶ 13.  Although they appear to have been available to him for review, plaintiff was not provided with a copy of either the facility rule book or the grievance procedure.  Amended Complaint (Dkt. No. 12) ¶ 23.

B.    Missing Belongings

In accordance with the policy in existence at the HCJ at the relevant times, each inmate is given a milk crate, which is tagged with the prisoner's name, in which to place clothing.  Parker Aff. (Dkt. No. 33-3) ¶ 16.  Clothing that does not fit within the milk crate is hung in a closet at the facility.  *Id.*  This practice was apparently followed with respect to the plaintiff.  *Id.*

Shortly after his arrest on June 27, 2002, a relative of the plaintiff

---

[1]    Plaintiff disputes the availability of a functional grievance procedure at the facility. *See* Amended Complaint (Dkt. No. 12) ¶ 15 ("[t]here is no prison grievance procedure at the [HCJ]"); Liggins Aff. (Dkt. No. 39) ¶ 6(gg) ("[i]ntake made mention of a grievance book however I was never permitted to use this procedure").

[2]    While Sheriff Parker indicates that the grievance book is attached to as Exhibit 16 to the affidavit of defendants' counsel, that procedure manual does not accompany Exhibit 16 as filed with the court and I have been unable to locate it among the voluminous materials submitted by defendants in conjunction with their motion.

delivered dress clothes to the HCJ for his use during court appearances; though later recovered on or about October 9, 2003 from a cabinet outside of another prisoner's cell door, those dress clothes were apparently misplaced for a time.  Amended Complaint (Dkt. No. 12) ¶¶ 18, 32.  In addition to his missing court clothes, plaintiff also maintains that at one point in October of 2002, prison officials at the HCJ misplaced a tee shirt and a CD, following his return from a brief stay at the Central New York Psychiatric Center in Marcy, New York; those items, however, were discovered in January of 2003 in a trash bag located within a milk crate. Amended Complaint (Dkt. No. 12) ¶ 33.

  C. Attorney Access

  One of the central issues raised in plaintiff's complaint concerns communications with attorneys in connection with the pending criminal prosecution against him.  There is no specific written policy in existence at the HCJ governing telephonic communication between inmates and their attorneys; as a matter of practice, however, inmates are permitted to call their attorneys of record upon request, subject only to the availability of telephone facilities.  Parker Aff. (Dkt. No. 33-3) ¶ 17.  In-person legal visitation is a matter governed by a specific policy under which inmates

are allowed to receive visits from their attorneys during normal hours of operation, provided that no disruption of the facility's operations results. *Id.* ¶ 18.

While acknowledging these policies, plaintiff attributes the failure of his first court appointed lawyer, Sterling Goodspeed, Esq., to visit him over the summer of 2002 to defendants' actions.  Amended Complaint (Dkt. No. 12) ¶ 36.  Neither plaintiff's complaint nor his affidavit in opposition to defendants' motion, however, supplies further amplification, nor does the record contain anything tending to corroborate his claim that the lawyer's failure to visit him is properly attributable to defendants' policies or actions.[3]

As a result of his inability to communicate with Attorney Goodspeed, plaintiff retained attorney Richard Bach, Esq., of Utica, New York. Amended Complaint (Dkt. No. 12) ¶¶ 37-39.  After announcing during a court appearance in mid-September of 2002 that he had retained that

_____

[3]      In their motion, defendants note that plaintiff was able to confer by telephone with Attorney Goodspeed following his initial booking into the HCJ, and that he was always permitted by prison officials to speak with Attorney Goodspeed by telephone or to receive his visits.  Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 44-45, 136 and Exh. 16-B.  A log maintained at the HCJ reflects several telephone conversations between the plaintiff and Attorney Goodspeed, as well as calls made by the plaintiff to other attorneys during the time that Goodspeed acted as his counsel of record. *See* Defendants' Exhibits (Dkt. No. 34) Exh. 16-B.

6

attorney to replace court-appointed lawyer Goodspeed, plaintiff received a letter from Attorney Bach advising that he was unable to represent him and stating, in relevant part, as follows: "In reviewing my upcoming trial schedule–I have determined that I would be unable to represent Jeffrey in the manner which would best serve his legal interest."  Defendants' Exhibits (Dkt. Nos. 34-35) Exh. 14 at pp. 63, 72-77 and Exh. 20.  Though once again offering no specifics or corroborating evidence, plaintiff attributes the withdrawal of Attorney Bach and the return of his retainer to counsel's inability to speak with Liggins by telephone.  Amended Complaint (Dkt. No. 12) ¶¶ 37-39.

Following Attorney Bach's withdrawal, the court appointed a second attorney, William Martuscello, Esq., to represent the plaintiff.  Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 80-81.  That attorney represented Liggins in the course of the criminal prosecution against him up until the time of his sentencing.  Defendants' Exhibits (Dkt. No. 34) Exh. 14 at p. 10.

    D.    <u>Monitoring of Telephone Calls</u>

Plaintiff asserts that while speaking by telephone with attorneys or family members from the jail he could hear indications that his

conversations were being monitored, including clicking sounds and other

voices.  Amended Complaint (Dkt. No. 12) ¶ 41.  In response, defendants

assert that pursuant to the policy in effect at the HCJ, prison officials are

typically present during, and monitor inmate non-legal telephone

conversations, although they are able to hear only the inmate portion of

any given conversation.[4]  Parker Aff. (Dkt. No. 33-3) ¶¶ 26-27.  Plaintiff

attributes any clicking or other similar sounds to "technical difficulties"

resulting from having only one line into the facility.  *See* Defendants'

Exhibits (Dkt. No. 34) at pp. 66-67.

>       E.      Access to Law Library and Legal Materials

Another facet of plaintiff's complaint concerns the availability of legal

resources at the prison.  Plaintiff maintains that the refusal of prison

officials to make photocopies of legal documents without charge, the lack

of "trained personnel to assist in the preparation of legal documents[,]" and

the unavailability of a law library within the facility, impermissibly interferes

with the right of inmate court access, in violation of the First Amendment.

Amended Complaint (Dkt. No. 12) ¶¶ 44-45; Liggins Aff. (Dkt. No. 39) ¶

6(p).

---

[4]       Significantly, that policy did not apply to inmate conversation with
attorneys, which remained private and confidential.  Parker Aff. (Dkt. No. 33-3) ¶ 28.

Because of its small size, the HCJ does not contain a law library, nor does it have a specific written policy concerning library use.  Parker Aff. (Dkt. No. 33-3) ¶¶ 49-51.  In practice, however, inmates at the facility are afforded the opportunity to request legal materials, which are then retrieved from a law library maintained within the county supervisor's office, a short distance from the jail facility.  *Id.*  While on occasion plaintiff did apparently request legal materials, and did not always receive the correct books, he was ultimately provided with the requested legal materials.  *Id.*; *see also* Liggins Aff. (Dkt. No. 39) ¶ 6(q), (r) (Dkt. No. 12).  It should be noted, moreover, that those requests were made at a time when Liggins was represented by counsel, and thus any failure to provide him with legal materials did not hinder his ability to defend against pending criminal charges.  *See* Defendants' Exhibits (Dkt. No. 34) Exh. 14 at p. 95.

F.    Medical Care and Treatment

Another major focus of plaintiff's multi-faceted complaint is the medical care and treatment which he received while confined by the defendants within the HCJ.  Plaintiff's medical care claim falls into two categories, one addressing his exposure to second hand smoke, or environmental tobacco smoke ("ETS"), and the second related to a

chronic back condition which, he maintains, was inadequately addressed by the defendants during his stay there.

### 1.   ETS

Plaintiff maintains that subsequent to his arrival at the HCJ in June of 2002, he was subjected to second hand smoke at the hands of fellow inmates as well as jail workers.  Amended Complaint (Dkt. No. 12) ¶¶ 27-28, 48.  According to the plaintiff, not only was smoking not prohibited at the HCJ but in fact inmates' smoking habits were encouraged by jail officials who were known to transport them to local ATM machines to withdraw cash for the purchase of cartons of cigarettes, and to go to the store for inmates on Thursdays and Fridays for the purpose of purchasing cigarettes.  *Id.* ¶¶ 47-48.

In January of 2003, as a direct result of plaintiff's complaints regarding exposure to second hand smoke, defendant Parker implemented a smoking ban, applicable to both inmates and employees alike, within the entire inside HCJ facility.[5,6]  Parker Aff. (Dkt. No. 33-3) ¶

---

[5]     According to the plaintiff, there was a no-smoking policy in effect at the HCJ at the time of his arrival in June of 2002, although it was not enforced until January, 2003.  Liggins Aff. (Dkt. No. 39) ¶ 6(d).

[6]     Shortly after the smoking ban went into effect plaintiff was separated from two inmates who were smokers.  Parker Aff.  (Dkt. No. 33-3) ¶ 82.  That separation was implemented for plaintiff's protection, with defendants fearing the possibility of

77.  In accordance with that ban, which was strictly enforced, neither employees nor inmates were permitted to smoke inside of the facility.  *Id.* ¶ 78.

Prior to implementation of the smoking ban, while employees and inmates were permitted to smoke, the plaintiff and other non-smoking inmates were free to move about the facility between 7:00 am and 11:00 pm, in such a way as to avoid anyone smoking.  Parker Aff. (Dkt. No. 33-3) ¶ 80.  Plaintiff and other inmates were also permitted to open windows to obtain ventilation of smoke.  *Id.* ¶ 81.  Additionally, in response to his complaints regarding ETS, plaintiff was offered the option of a second floor cell; Liggins, however, refused that proposed transfer.  Parker Aff. (Dkt. No. 33-3) ¶ 76.

2.   Plaintiff's Back Condition

At the time of his entry into the HCJ, plaintiff had a documented history of a chronic lumbar back condition.  Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 103-09, 123-24; Eagan Aff. (Dkt. No. 33-4) ¶¶ 2-3;  *see also* Defendants' Exhibits (Dkt. No. 35) Exh. 17.  Records associated with plaintiff's pre-custodial medical treatment reveal that well prior to his

---

retaliation against the plaintiff for implementation of the smoking ban.  Parker Aff. (Dkt. No. 33-3) ¶ 82.  That separation was short-lived, however, in light of assurances by the plaintiff that he did not fear being harmed as a result of the smoking ban.  *Id.* ¶ 83.

11

incarceration at the HCJ he was diagnosed as suffering from degenerative disc disease and a herniated disc at L5-S1.  *Id.*

In light of the size of the facility the HCJ does not employ a physician working at the jail; instead, HCJ inmates in need of medical care are treated by physicians and other medical personnel employed at the Speculator Primary Care Center or the Nathan Littauer Hospital, both of which apparently are located relatively near the prison facility.  Parker Aff. (Dkt. No. 33-3) ¶ 58; Defendants' Exhibits (Dkt. No. 34) Exh. 14 at p. 130.

Plaintiff initially was seen at the Speculator Health Center for his low back pain on August 9, 2002, at which time he was treated with a muscle relaxant but found to be neurologically intact.  Defendants' Exhibits (Dkt. No. 35) Exh. 15-A.  From that point until August 18, 2002, when plaintiff was taken to the Nathan Littauer Hospital Emergency Room complaining of low back discomfort, though without radicular pain, plaintiff's condition was treated with anti-inflammatory medications, pain medication and/or muscle relaxants on almost a daily basis.  *Id.*  Notes from that emergency room visit record a history of a herniated disc and pain "on and off" for ten years, with a diagnosis of acute exacerbation of chronic low back strain/spasm, but with no acute disc herniation or neurological problems requiring further specialty care.  *Id.*; *see also* Eagan Aff. (Dkt. No. 33-4) ¶

12

5.  Following that emergency room visit prison officials at the HCJ continued to treat the plaintiff's condition with anti-inflammatory medications, pain relief medication and/or muscle relaxants on a daily basis.  Defendants' Exhibits (Dkt. No. 34) Exh. 15-D.

Plaintiff was next seen by outside medical professionals on September 27, 2002 when he was taken to the Speculator Primary Care Center complaining of shortness of breath, chest pain and back pain experienced after opening a window.  Defendants' Exhibits (Dkt. No. 35) Exh. 15-A.  Plaintiff was taken on that same day to Nathan Littauer Hospital for a chest x-ray and EKG, and was diagnosed as suffering from musculoskeletal pain and was prescribed medication for the pain.  *Id.*

Plaintiff was taken to the Speculator Primary Care Center on October 8, 2002, again complaining of back pain.  Defendants' Exhibits (Dkt. No. 35) Exh. 15-A.  On that occasion, plaintiff was diagnosed with acute lumbosacral strain with spasms, and was prescribed various medications.[7]  *Id.*

Plaintiff was returned to the Speculator Primary Care Center on March 17, 2003, complaining of worsening pain based upon daily exercise

_____

[7]    According to the HCJ medication log, at or about this time plaintiff refused medication offered to him on three separate occasions.  Defendants' Exhibits (Dkt. No. 34) Exh. 15-D.

from December of the previous year.  Defendants' Exhibits (Dkt. No. 35) Exh. 15-A.  On that occasion plaintiff was diagnosed as suffering from chronic lumbosacral spine spasm/strain.  *Id.*  An x-ray of plaintiff's lumbar spine taken at Nathan Littauer Hospital two days later revealed disc space narrowing at L5-S1, but with no fractures.  *Id.* Exh. 15-A.  Plaintiff continued receiving muscle relaxers on almost a daily basis between that time and his transfer out of the jail into the Clinton Correctional Facility on April 1, 2003.  *Id.* Exh. 15-A, 15-D.

At the heart of plaintiff's claims regarding the defendants' treatment of his back condition is his contention that he requested but was denied magnetic resonance imaging ("MRI") testing to determine the cause and the extent of his back pain, and that while x-rays were ultimately taken, as requested, he was not promptly notified of their results.[8, 9]  *See* Amended

---

[8]     Plaintiff's medical records do not substantiate his claim of having requested MRI testing of his back during his stay at the HCJ.  *See* Defendants' Exhibits (Dkt. No. 35) Exh. 15-A.

[9]     According to the plaintiff, shortly after his transfer out of the HCJ he was administered an MRI, revealing a herniated disc, chronic degenerative disc disease of the lumbar region, narrowing of the disc space at L4-L5, and paracentral disc extrusion in contact with a nerve, and was scheduled for an epidural steroid injection.  Liggins Aff. (Dkt. No. 39) ¶ 6(o).  Defendants' medical expert, Dr. Eagan, confirms that such an MRI was conducted on May 19, 2003, but notes that while there was contact with the S1 nerve there was no displacement of the nerve root, and x-rays taken on June 10, 2003 revealed only mild degenerative disc disease.  *See* Eagan Aff. (Dkt. No. 33-4) ¶ 6.

Complaint (Dkt. No. 12) ¶¶ 50-57; Liggins Aff. (Dkt. No. 39) ¶ 6(h)-(o).

In sum, it appears that while incarcerated at the HCJ between June 27, 2002 and April 1, 2003 plaintiff was treated on at least eight separate occasions for that condition by outside sources, and was provided medications on a regular basis to assist him in coping with his pain.  It is true, as defendants acknowledge, that on between three and five occasions plaintiff requested to be seen by a doctor for his back pain; those requests, however, were denied on the basis either that they were made on weekends, when there were no deputies available for transport, or at times when snow conditions made travel hazardous.  Defendants' Exhibits (Dkt. No. 34) Exh. 6 (Defendants' Responses to Interrogatories) ¶ 3(e)(1)(iii); Exh. 14 at pp. 112, 119; *see also* Amended Complaint (Dkt. No. 12) ¶ 49.  The records also disclose, however, that plaintiff declined offers of doctor visits on several occasions including on January 6, 2003.  Defendants' Exhibits (Dkt. No. 34) Exh. 10-D and Exh. 14 at pp. 112-13.

G.    Unprofessional Conduct and Other Miscellaneous Complaints

Interspersed among the more serious claims set forth in this complaint, as amended, are allegations by the plaintiff of unprofessional conduct and unpleasant conditions experienced by the plaintiff as a result of the defendants' actions.  Typical of those are allegations that 1) inmates

15

are not properly overseen when washing and returning dishes for reuse, Amended Complaint (Dkt. No. 12) ¶ 66; 2) on one occasion, at plaintiff's request, prison officials purchased for him bread which later turned out to contain mold, *id.* ¶ 68; 3) dust is allowed to accumulate in the facility, *id.* ¶ 74; 4) there is evidence of insects, mosquitos and mice located within the jail, *id.* ¶¶ 74-77; 5) Liggins was required to use a cup with dry black stains on the outside when served milk by prison officials, *id.* ¶ 83-85; 6) prison administrators failed to properly supervise and monitor inmates, *id.* ¶¶ 87-92; and 7) prison guards were permitted to use inappropriate language, failed to wear proper uniforms or to wear name tags, and were permitted to wear denim jeans, *id.* ¶ 21.

II.   <u>PROCEDURAL HISTORY</u>

Plaintiff commenced this action on August 16, 2004 and, at the direction of the court, filed an amended complaint on September 30, 2004. Dkt. Nos. 1, 8, 12.  Named as defendants in plaintiff's complaint, as amended, are Hamilton County; Hamilton County Sheriff Douglas Parker; the Hamilton County Sheriff's Department; and several Hamilton County employees, including Corrections Lieutenant Carl Abrams, and Corrections Officers Robe Doe, Mike Doe and Dan Doe, each of whose

last names are unknown to the plaintiff.[10]  Plaintiff's complaint asserts

various claims under the Eighth and Fourteenth Amendments to the

United States Constitution, as well as alleging defendants' violation of

state law and regulation associated with the operation of the HCJ.  Dkt.

No. 12.

On September 21, 2006, following the joinder of issue and

completion of pretrial discovery, defendants moved seeking summary

judgment dismissing plaintiff's complaint in its entirety.  Dkt. Nos. 33-35.

In their motion, defendants argue that, as a matter of law, plaintiff's claims

are deficient on the merits, and additionally assert their entitlement to

qualified immunity from suit.  *Id.*  Plaintiff has since submitted an affidavit

and memorandum in opposition to defendants' motion.[11]  Dkt. No. 39.

With the filing of that opposition and a subsequent reply on behalf of the

defendants, filed on January 3, 2007, *see* Dkt. No. 41, this matter is now

ripe for determination and has been referred to me for the issuance of a

---

[10]     While the Hamilton County Court was also named as a defendant in plaintiff's initial complaint, the court *sua sponte* ordered dismissal of his claims against that entity based upon a routine review of plaintiff's complaint and *in forma pauperis* application.  *See* Dkt. No. 5.

[11]     As will be seen, plaintiff's opposition papers do not include a response to defendants' statement of material facts not in dispute, submitted pursuant to Northern District of New York Local Rule 7.1(a)(3).  *See* pp. 20-23, *post.*

report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and

Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P.

72(b).

III.   DISCUSSION

    A.   Summary Judgment Standard

    Summary judgment is governed by Rule 56 of the Federal Rules of

Civil Procedure.  Under that provision, summary judgment is warranted

when "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits . . . show that there is no

genuine issue as to any material fact and that the moving party is entitled

to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505,

2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line,*

*Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes

of this inquiry, if it "might affect the outcome of the suit under the

governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also*

*Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing

*Anderson*).  A material fact is genuinely in dispute "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.[12]  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553;

---

[12]     In their reply papers, defendants argue that in order to avoid summary judgment the plaintiff was not entitled to rest upon the allegations of his complaint, but instead was duty bound to come forward with materials of evidentiary value in order to demonstrate the existence of genuine, triable issues of material fact, citing, *inter alia, Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir. 1994).  *See* Defendants' Reply Memorandum (Dkt. No. 41-2) at 2.  This argument, however, overlooks the fact that plaintiff's *pro se* complaint in this action is signed by the plaintiff

*Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

   B.   Plaintiff's Failure to Provide a Local Rule 7.1(a)(3) Counterstatement of Disputed Facts

In support of their motion defendants have submitted a comprehensive statement of material facts which, they contend, are not genuinely disputed, as required by Rule 7.1(a)(3) of this court's local

---

under penalty of perjury, and consequently represents the functional equivalent of an affidavit, *see Franco v. Kelly*, 854 F.2d 584, 587 (2d Cir. 1998) (citations omitted); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995), thus readily distinguishing this case from the circumstances extant in *Rexnord Holdings*.

rules.[13]  *See* Dkt. No. 33-5.   Plaintiff's opposing motion papers, however,

fail to contain such a statement or to otherwise specifically address the

assertions set forth in defendants Local Rule 7.1(a)(3) statement.  In their

reply, defendants argue that this shortcoming carries with it fatal

consequences, establishing their entitlement to the relief sought in their

motion.  As a threshold procedural matter, I must address the significance,

if any, of plaintiff's failure to properly respond to defendants' 7.1(a)(3)

statement.

---

[13]      That rule provides, in relevant part, that

> [a]ny motion for summary judgment shall
> contain a Statement of Material Facts.  The
> Statement of Material Facts shall set forth, in
> numbered paragraphs, each material fact
> about which the moving party contends there
> exists no genuine issue.  Each fact listed shall
> set forth a specific citation to the record where
> the fact is established. . . .

                              *   *   *

> The opposing party shall file a response to the
> Statement of Material Facts. The non-
> movant's response shall mirror the movant's
> Statement of Material Facts by admitting
> and/or denying each of the movant's
> assertions in matching numbered
> paragraphs. . . .

N.Y.N.D.L.R. 7.1(a)(3).  Plaintiff was reminded of the requirements of this meaningful
rule through defendants' attachment to their notice of motion of this court's "Notification
Of The Consequences Of Failing To Respond To A Summary Judgment Motion."  *See*
Dkt. No. 33-6.

Undeniably, the consequences of plaintiff's failure to properly refute the assertions set forth in defendants' rule 7.1(a)(3) statement are potentially significant.  By its express terms, Local Rule 7.1(a)(3) provides that "[a]ny facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."  *See* N.D.N.Y.L.R. 7.1(a)(3).  This and similar rules from other districts are routinely enforced by courts, resulting in facts set forth in such statements being deemed as admitted based upon an opposing party's obligation to respond properly to the statement.  *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

In this instance, while it is true that the plaintiff is in technical violation of the provisions of Local Rule 7.1(a)(3), he has not totally defaulted in connection with defendants' summary judgment motion, and indeed has clearly articulated in his opposing memorandum and affidavit – albeit in an extremely terse and conclusory fashion – his position concerning each of the factual matters at issue in this case.  Accordingly, and in view of his *pro se* status and the reluctance of courts to decide

22

cases on the basis of such procedural shortcomings, *see Lucas v. Miles*, 84 F.3d 532, 535 (2d Cir. 1996), while underscoring the importance of Local Rule 7.1(a)(3) and its utility in ensuring an orderly and reasoned presentation to the court of summary judgment motions, I nonetheless recommend against a wooden application of the rule to deem all matters set forth in the defendants' Local Rule 7.1(a)(3) statement as admitted.

### C.   Court Access and Access to Counsel

In his complaint, plaintiff asserts that by their actions defendants unlawfully interfered with his access to counsel and the courts.  Plaintiff's court access claim is comprised of two distinct components.  Plaintiff initially asserts that while confined in the HCJ he was denied access to adequate legal resources, including a law library and photocopying facilities.  Additionally, Liggins maintains that prison officials at the HCJ interfered with and hampered communication with the lawyers representing him in the criminal matter which resulted in his confinement.

### 1.   Access to Legal Materials

The first portion of plaintiff's complaint relates to the alleged insufficiency of the legal materials and resources made available to inmates at the HCJ.  Defendants seek summary dismissal of this claim as a matter of law.

23

Without question, an inmate's constitutional right to "meaningful" access to the courts is firmly established.[14] *Bounds v. Smith*, 430 U.S. 817, 823, 97 S. Ct. 1491, 1495 (1977).  Although in *Bounds* the Supreme Court held that this right of access requires prison authorities "to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law[,]" *id.* at 828, 97 S. Ct. at 1498, the Court later clarified that

> prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.  Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense.

*Lewis v. Casey*, 518 U.S. 343, 351, 116 S. Ct. 2174, 2180 (1996) (internal quotations and citations omitted).  Instead, an inmate "must go one step further and demonstrate that the alleged shortcomings in the library or

---

[14]    The right of court access derives from the First Amendment.  *See Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 741, 103 S. Ct. 2161, 2169 (1983).  Although plaintiff's complaint does not purport to state a claim under that constitutional provision, in light of his *pro se* status I recommend that the court construe his complaint, as amended, liberally to assert such a cause of action.  *See Abbas v. Dixon*, 480 F.3d 636, 638 (2d Cir. 2007).

legal assistance program hindered his efforts to pursue a legal claim." *Id.*
In other words, to establish a violation of the right of access to the courts,
a plaintiff must demonstrate that defendants' interference caused him or
her actual injury – that is, that a "nonfrivolous legal claim had been
frustrated or was being impeded" as a result of defendants' conduct. *Id.* at
352, 116 S. Ct. at 2181.  This is a particularly challenging requirement to
meet in a case such as this, where the prison inmate asserting the court
access denial claim is represented by legal counsel in the civil or criminal
matter at issue.  *See Santiago v. New York City Dep't of Corr.*, 2003 WL
1563773, at *6 n.2 (S.D.N.Y. Mar. 6, 2003) (noting that where an inmate is
represented by counsel, "there can be no violation of his constitutional
right to access to the courts as a matter of law") (quotations omitted)
(collecting cases); *see also Smith v. City of New York*, No. 03 Civ. 7576,
2005 WL 1026551, at * 7 (S.D.N.Y. May 3, 2005).

     It should be noted, moreover, that the law does not mandate that
every prison facility, however small in size, maintain a physical library for
use by inmates.  *See Bounds*, 430 U.S. at 830-31, 97 S. Ct. at 1499.
Indeed, courts have approved alternative measures deemed sufficient to
afford appropriate legal materials in settings comparable to those now
presented.  *See, e.g., Holmes v. Buffardi*, No. 9:01-CV-980, Dkt. No. 17

25

(N.D.N.Y. May 9, 2002) (DiBianco, M.J.), *aff'd*, Dkt. No. 19 (N.D.N.Y. June

10, 2002) (Kahn, J.); (approving of the provision of legal materials through

use of a CD Rom system); *Torres v. Buffardi*, No. 9:01-CV-1599, Dkt. No.

12 (N.D.N.Y. May 9, 2002) (DiBianco, M.J.), *aff'd*, Dkt. No. 13 (N.D.N.Y.

June 12, 2002) (Kahn, J.) (approving of the provision of legal materials

through use of a CD Rom system).

    As a small, six-cell facility, the HCJ does not include a law library.

Parker Aff. (Dkt. No. 33-3) ¶¶ 8, 49-53.  Instead, inmates are informed that

upon request prison officials will retrieve law books and legal materials

from the local county supervisor's office, which is within walking distance

from the jail, and provide them to inmates.  *Id.* ¶¶ 50-51.  According to

Sheriff Parker, each time the plaintiff requested legal materials, they were

provided through this mechanism.[15]  *Id.* ¶ 52.  Such an alternative

_____

    [15]    In his answering affidavit, submitted in opposition to defendants' motion,
Liggins asserts that he requested legal materials on several occasions to assist in the
preparation of his defense and to prepare for sentencing but that "[t]he guards failed to
provide the correct material."  *See* Liggins Aff. (Dkt. No. 39) ¶ 6(r).  This statement,
however, is at odds with plaintiff's deposition testimony, during which he acknowledged
that while on occasion guards would return with the wrong legal materials, he would
then be provided with the requested materials a few days later.  *See* Defendants'
Exhibits (Dkt. No. 34) Exh. 14 at p. 95; *see also* Parker Aff. (Dkt. No. 33-3) ¶ 53.  An
affidavit given in opposition to a summary judgment motion which contradicts other
sworn statements of the opposing party cannot alone suffice to raise a genuine issue of
material fact.  *See Reisner v. Gen. Motors*, 671 F.2d 91, 93 (2d Cir.) (disregarding
factual claims made in opposition to summary judgment motion which contradicted
earlier affidavits, deposition testimony, and interrogatory responses), *cert. denied*, 359
U.S. 858, 103 S. Ct. 130 (1982).

measure to maintaining a complete library for a six-cell prison facility suffices to satisfy the constitutional court access mandate, and no reasonable factfinder could conclude otherwise.  *See*, *e.g.*, *Saucedo v. Enders*, No. Civ. EP03CA433, 2004 WL 911309, at *2 (W.D. Tex. Apr. 16, 2004) ("[A]ccess to the courts may be satisfied either by availability of legal materials, by counsel, or by any other appropriate device of the State; . . . [the] alternatives open to the State are legion.") (quoting *Cruz v. Hauck*, 515 F.2d 322, 331 (5th Cir. 1975)).

In addition to failing to establish a deprivation of constitutional significance resulting from the lack of a prison library at the HCJ, plaintiff has also failed to establish that he suffered prejudice as a result of that shortcoming.  It is well-established that a necessary component of a court access deprivation claim under the First Amendment is the showing of actual injury sustained as a direct consequence of the deprivation.  *Lewis,* 518 U.S. at 351-53, 116 S. Ct. at 2180-81; *Monsky v. Moraghan,* 127 F.3d 243, 246-47 (2d Cir. 1997) (citing *Lewis*), *cert. denied*, 525 U.S. 823, 119 S. Ct. 66 (1998).  As was previously discussed, to sustain a First Amendment court access claim a plaintiff must prove that he or she was hindered in the pursuit of a nonfrivolous legal claim as a result of the alleged constitutional violations.  *Lewis,* 518 U.S. at 351-55, 116 S. Ct. at

2180-81; *see also Warburton v. Underwood,* 2 F. Supp. 2d 306, 312

(W.D.N.Y. 1998).  In this instance, plaintiff has not established the

existence of any such injury.  Unlike plaintiffs in many First Amendment

court access claims arising under 42 U.S.C. § 1983, the plaintiff in this

instance was represented by counsel at all stages of the criminal

prosecution against him.  Plaintiff's bare, conclusory allegation that

because of defendants' actions he was ill-prepared to enter a plea and for

sentencing are wholly unavailing to establish a cognizable injury resulting

from the alleged First Amendment violation.

2.     <u>Interference With Communications With Attorneys</u>

The second aspect of plaintiff's court interference claim arises from

limitations allegedly placed by the defendants on his ability to select and

communicate with an attorney to represent him in connection with the

pending criminal proceedings.  *See* Amended Complaint (Dkt. No. 12) ¶¶

35-41.  "[T]he right to counsel and the right of access to the courts are

interrelated, since the provision of counsel can be a means of accessing

the courts."  *Benjamin v. Fraser*, 264 F.3d 175, 186 (2d Cir. 2001).  The

Second Circuit has determined that, in cases involving a pretrial

detainee's right to utilize counsel in his defense, both the due process

right of access to the courts and the Sixth Amendment right to counsel are

implicated.  *Id.* at 187 (considering whether prison restrictions on pretrial detainees' visits with their attorneys violated the detainees' rights to counsel and of access to the courts).  Where a plaintiff contests his or her access to counsel as a pretrial detainee, the court must consider whether the challenged prison conduct "'unjustifiably obstruct[s] the availability of professional representation or other aspects of the right of access to the courts'" in light of "'the central objective of prison administration, safeguarding institutional security.'"  *Id.* at 187 (quoting *Procunier v. Martinez*, 416 U.S. 396, 419, 94 S. Ct. 1800, 1814 (1974), *overruled on other grounds*, *Thornburgh v. Abbott*, 490 U.S. 401, 109 S. Ct. 1974 (1989) and *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S. Ct. 1861, 1878 (1979)); *see also Elmaghraby v. Ashcroft*, No. 04 CV 1409, 2005 WL 2375202, at *22 (E.D.N.Y. Sept. 27, 2005), *affirmed in part*, *reversed in part*, *remanded by*, *Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007).

In the instant case, plaintiff alleges that once he determined to retain counsel in order to replace his court appointed lawyer, he was provided with an antiquated, out-of-date version of the telephone book yellow page business entries.  *See* Amended Complaint (Dkt. No. 12) ¶ 37.  During his deposition, however, plaintiff acknowledged that a short time later he was provided with a more current version, and that he did not have any court

29

appearances during the intervening time period while he was awaiting an

updated telephone book.   Defendants' Exhibits (Dkt. No. 34) Exh. 14 at

pp. 59-61.  Defendants' exhibits, moreover, including logs of telephone

contacts, reveal that plaintiff was able to communicate on several

occasions with his newly retained attorney, Richard Bach, Esq., who while

initially agreeing to represent him later declined the role and returned

plaintiff's retainer to him.  Defendants' Exhibits (Dkt. Nos. 34-35) Exh. 14

at pp. 63, 72-77 and Exh. 20.  By the time of his plea and subsequent

sentencing, Liggins was represented by yet another assigned counsel,

William Martuscello.  The record thus discloses no unjustifiable obstruction

by prison officials of Liggins' ability to communicate with his lawyers.

Plaintiff's access claim arising from alleged interference with

communications with his lawyers is therefore subject to dismissal as a

matter of law.[16]  *See*, *e.g.*, *Beyah v. Putman*, 885 F. Supp. 2d 371, 374075

(N.D.N.Y. 1995) (Baer, J.) (rejecting pretrial detainee's claims that the

limitation of his telephone privileges violated his right to access the courts

---

[16]    One portion of plaintiff's court access claim surrounds his suspicion that defendants were responsible for his sentencing being advanced from the originally scheduled date. *See* Amended Complaint (Dkt. No. 12) ¶¶ 61-62.  During his deposition, however, plaintiff acknowledged that his allegations in that regard were the result of sheer surmise as to the defendants' involvement in the establishment of his sentencing date, and the record contains nothing of evidentiary value to substantiate his suspicions in this regard.  Defendants' Exhibits (Dkt. No. 34) Exh. 14 at pp. 102-03.

and his right to legal counsel where detainee conceded he was permitted to call his counsel and stated only that his personal calls were restricted).

### D.   Prison Conditions

At the heart of plaintiff's diverse and amalgamated claims is his complaint regarding the conditions to which he was exposed during the period of incarceration at the HCJ.[17]  Plaintiff asserts that those conditions, when considered in their totality, resulted in a deprivation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

As a pretrial detainee, plaintiff's conditions of confinement were subject to safeguards emanating from the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which governs such claims brought by inmates serving prison sentences. *Benjamin v. Fraser*, 343 F.3d 35, 49-50 (2d Cir. 2003).  Under the Due

---

[17]     Many of the claims made by Liggins fail to identify a particular defendant as the party responsible for the constitutional deprivation alleged.  Although defendants have not raised this issue in their motion, the lack of a showing of personal involvement on the part of various defendants could provide a proper basis for dismissal of those claims for which no responsible party has been identified.  *See Bass v. Jackson*, 790 F.2d 260, 263.  And, while plaintiff appears to assert liability on the part of Sheriff Parker, that liability is plainly based upon his role in overseeing the jail facility and, there being no *respondeat superior* liability under 42 U.S.C. § 1983, *see Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003), his role is in and of itself insufficient to establish his personal involvement in many of the complained of acts. *Id.*; *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

Process Clause, government officials may subject a pretrial detainee to restrictions inherent to confinement in a detention facility so long as the resulting conditions do not "amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1872 (1979). "Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense[.]" *Id.* at 537, 99 S. Ct. at 1873. As the court noted in *Benjamin v. Fraser*, however, "because this punitiveness inquiry focuses principally on the *purpose* of an imposed disability, it is of limited utility when evaluating the environmental challenges to prison conditions at issue in this case, which . . . were not affirmatively imposed." 343 F.3d at 50 (emphasis in original).

In *Benjamin*, the Second Circuit acknowledged the government's duty to assume responsibility for the safety, general well-being, and basic human needs of those whose liberty it involuntarily restrains, and specifically distinguished between the circumstances presented by a pretrial detainee, who is still presumed innocent, and an inmate who has been convicted of a crime. *Id.* at 50-51. In light of those considerations, the court held that "although a pretrial inmate mounting a constitutional challenge to environmental conditions must show deliberate indifference, it may generally be presumed from an absence of reasonable care";

32

according to the Second Circuit, an inmate who challenges prison conditions like the ones at issue in *Benjamin* and in the instant case need not "show anything more than actual or imminent substantial harm." *Id.*

>    1.    Deliberate Medical Indifference

A portion of plaintiff's complaint addresses the medical care provided to him and other inmates at the HCJ.  Plaintiff complains, for example, of the fact there is no physician actually present and on staff at the jail facility.  *See*, *e.g.*, Amended Complaint (Dkt. No. 12) ¶ 49.  Plaintiff also challenges the medical care provided for his back condition, and specifically the failure of prison officials to arrange for MRI testing despite requests for such testing by him on several occasions.  *Id.* ¶¶ 50-57.

In contrast to the well-established body of jurisprudence addressing deliberate medical indifference claims of sentenced prisoners under the Eighth Amendment, there is both a dearth of case law and significant uncertainty surrounding the precise standard to be applied to such claims brought by pretrial detainees.  That such claims are subject to analysis under the Due Process Clause of the Fourteenth Amendment is clear. *Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir. 1991).  The precise contours of the medical care obligation imposed under the Due Process Clause with respect to pretrial detainees, however, have not been firmly

defined by either the Second Circuit or the Supreme Court.  *See Pressley v. Green,* No. 02 CIV. 5261, 2004 WL 2978279, at \*3 (S.D.N.Y. Dec. 21, 2004).  Since the Second Circuit has seemingly endorsed, at least implicitly, application of the Eighth Amendment's analysis to such claims, *id*.; *see also Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir. 2000) (applying the Due Process Clause of the Fifth Amendment to a deliberate indifference claim brought by a federal pretrial detainee, and noting that "[w]e have often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment") (citations omitted), I will look to the now-familiar medical indifference Eighth Amendment standards for guidance.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1076, 1084 (1986) (citing, *inter alia*, *Estelle*).  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject

34

to Eighth Amendment scrutiny.  *Farmer v. Brennan,* 511 U.S. 825, 832,

114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337,

349, 101 S. Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment

must satisfy both an objective and subjective requirement – the conditions

must be "sufficiently serious" from an objective point of view, and the

plaintiff must demonstrate that prison officials acted subjectively with

"deliberate indifference."  *See Leach v. Dufrain,* 103 F. Supp. 2d 542, 546

(N.D.N.Y. 2000) (Kahn, J.) (citing *Wilson v. Seiter*, 501 U.S. 294, 111 S.

Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at

*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also*,

*generally*, *Wilson*, 501 U.S. 294, 111 S. Ct. 2321.  Deliberate indifference

exists if an official "knows of and disregards an excessive risk to inmate

health or safety; the official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists,

and he must also draw the inference."  *Farmer*, 511 U.S. at 837, 114 S.

Ct. at 1978; *Leach*, 103 F. Supp. 2d at 546 (citing *Farmer*); *Waldo*, 1998

WL 713809, at *2 (same).

a)      Serious Medical Need

In order to state a medical indifference claim under the Eighth

35

Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, "'sufficiently serious.'" *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citing *Wilson*, 501 U.S. at 298, 111 S. Ct. at 2324), *cert. denied sub nom.*, *Foote v. Hathaway*, 513 U.S. 1154, 115 S. Ct. 1108 (1995).  A medical need is serious for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (citations omitted).  A serious medical need can also exist where "'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain'"; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts*. Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000) (quoting, *inter alia*, *Chance*).  Relevant factors in making this determination include injury that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily activities, or causes "'chronic and substantial pain.'" *Chance*, 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County*, No. CIV. 9:00CV774, 2002 WL 31309244, at *2-*3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.).

In their motion defendants invite the court to conclude, as a matter of

36

law, that plaintiff's back condition does not constitute a sufficiently serious condition to rise to a level of constitutional significance.  In support of this assertion defendants offer the expert opinion of Dr. Thomas Stanford Eagan, a practicing orthopedic surgeon.  *See generally*, Eagan Aff. (Dkt. No. 33-4).  Based upon his review of plaintiff's medical records Dr. Eagan has opined, *inter alia*, that the progression of the protrusion of plaintiff's L5-S1 disc, identified as a condition which preexisted his incarceration at the HCJ, did not occur during the time of his incarceration there.  *Id.* ¶ 11. Dr. Eagan therefore concludes that "the worsening of plaintiff's back condition had no relationship to his confinement at the Hamilton County facility or to the treatment that the plaintiff received while confined at the Hamilton County Jail."  *Id.* ¶ 12.

In his response to defendants' motion, plaintiff has asserted that his back condition was "exacerbated" during his incarceration and that his conditions worsened during that time period.  *See* Liggins Aff. (Dkt. No. 39) ¶¶ 6(h), (j).  In light of this assertion and the pain which he claims to have experienced while at the HCJ due to his back condition, however skeptical I may be that a reasonable factfinder will ultimately agree with the plaintiff on this score, I am unable to say as a matter of law that plaintiff's back condition was not capable of causing a sufficient level of

pain or degenerating to such a degree as to constitute a serious medical condition to trigger the protections of the Eighth Amendment.

### b)   Defendants' Indifference

Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979; *Leach*, 103 F. Supp. 2d at 546 (citing *Farmer*); *Waldo*, 1998 WL 713809, at *2 (same).

It is well-established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105-06, 97 S. Ct. at 201-02; *Chance*, 143 F.3d at 703; *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir.), *cert. denied*, 506 U.S. 1040, 113 S. Ct. 828 (1992).  The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to

provide to their patients.  *Estelle*, 429 U.S. at 107, 97 S. Ct. at 293;
*Chance*, 143 F.3d at 703; *Rosales v. Coughlin*, 10 F. Supp. 2d 261, 264
(W.D.N.Y. 1998).

The record in this case reflects that defendants' efforts to address
plaintiff's medical needs far exceeded anything tantamount to indifference.
While having no medical personnel on staff at the facility, defendants
treated the medical needs of the plaintiff and other inmates by utilizing
resources available at nearby medical facilities, including the Speculator
Primary Care Center and Nathan Littauer Hospital.  Parker Aff. (Dkt. No.
33-3) ¶ 58.

A review of the relevant medical records reveals that plaintiff was
provided care at those facilities on several occasions, and that he was
provided or offered medication, including pain relievers and muscle
relaxants, on a frequent basis.  In the opinion of Dr. Eagan, based upon
his review of the plaintiff's medical records, not only was defendants' care
and treatment of the plaintiff not indifferent, but indeed during the time of
his incarceration at the HCJ it comported fully with generally accepted
standards in the medical community.  *See* Eagan Aff. (Dkt. No. 33-4) ¶ 16.

It is true that despite plaintiff's requests during the period of his
incarceration that he be provided with MRI testing, no such testing

occurred during that period.  Based upon his review of plaintiff's medical records, Dr. Eagan found no basis to conclude that the failure to provide an MRI represented a departure from the level of care ordinarily anticipated within the medical community.  Eagan Aff. (Dkt. No. 33-4) ¶ 16. In his affidavit, Dr. Eagan also noted that the MRI testing conducted on May 19, 2001 – some six weeks after plaintiff's transfer out of the HCJ – showed a paracentral disc extrusion on the right L5-S1 with no evidence of any neural-compression, and did not reveal the existence of neurological problems which would require further evaluation by an orthopedic or a neurosurgical specialist.  *Id.* ¶ 14.  At best, then, plaintiff's complaints regarding the failure to conduct MRI testing represent a classic disagreement by him with forms of treatment offered for his chronic back condition, and do not rise to a level of constitutional significance. *Rodriguez v. Yin,* 328 F. Supp. 2d 414, 416-17 (W.D.N.Y. 2004).

In sum, based upon the record now before the court, no reasonable factfinder could conclude that defendants were deliberately indifferent to plaintiff's serious medical needs.  *See Rodriguez,* 328 F. Supp. at 416-17. Accordingly, I recommend the dismissal of plaintiff's medical indifference claims.

2.      Exposure to Second-Hand Smoke

In another portion of his complaint implicating the Fourteenth Amendment, plaintiff also complains of exposure to second hand smoke, or environmental tobacco smoke ("ETS"), while incarcerated at the HCJ. Amended Complaint (Dkt. No. 12) ¶¶ 47-48.  Plaintiff's complaints in this regard are premised upon his allegation that corrections officers and other inmates were freely permitted to smoke near prisoners, including within the jail, during the period of his confinement.  *See id.*

In addressing plaintiff's ETS claims, which because of his status as a pretrial detainee arise under the Fourteenth Amendment, I have again drawn upon a well-established body of Eighth Amendment jurisprudence which differentiates between claims alleging present harm due to ETS exposure, and those complaining of future harm caused by exposure to second hand smoke.  *See Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001); *Henderson v. Sheahan*, 196 F.3d 839, 845-47 (7th Cir. 1999), *cert. denied*, 530 U.S. 1244, 120 S. Ct. 2691 (2000); *Oliver v. Deen*, 77 F.3d 156, 159-60 (7th Cir. 1996); *Goffman v. Gross*, 59 F.3d 668, 672 (7th Cir. 1995); *McPherson v. Coombe*, 29 F. Supp. 2d 141, 145 (W.D.N.Y. 1998); *see also*, *e.g.*, *Warren v. Keane*, 196 F.3d 330, 333 (2d Cir. 1999).

a)      Present Injury

41

Like other Eighth Amendment claims of deliberate indifference to medical needs, plaintiff's claim of ETS exposure endangering his existing health is governed by *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285 (1976). *Alvarado*, 267 F.3d at 651; *see also Davidson v. Coughlin*, 920 F. Supp. 305, 309 (N.D.N.Y. 1996) (McAvoy, C.J.). To state a claim under the objective prong of the *Farmer* test for present injury caused by ETS exposure, a plaintiff must show that ETS caused him or her to suffer serious adverse health consequences.[18] *Henderson*, 196 F.3d at 845. A serious medical need or injury is one that a physician has diagnosed as requiring treatment, which is so obvious that even a lay person would recognize the need for treatment. *Id.* at 846.

In this instance plaintiff does not seriously assert any present injury suffered by virtue of his exposure to ETS, nor do any records now before the court reflect the existence of such a reaction. While it is true that according to plaintiff's medical records he complained of shortness of breath attributed by him to exposure to ETS on at least one occasion, on September 27, 2002, when taken for treatment to the Speculator Center, a

---

[18]   In certain circumstances, exposure to ETS can also give rise to a cognizable constitutional claim when it has the known effect of aggravating an existing medical condition. *See*, *e.g.*, *Alvarado*, 267 F.3d at 651 (plaintiff stated Eighth Amendment claim under *Estelle* when he submitted documentation showing that his severe chronic asthma was made worse by ETS).

chest x-ray taken on that date at Nathan Littauer Hospital proved negative, and there is no indication in plaintiff's medical records of any asthma or similar condition which would be directly caused or triggered by his exposure to ETS.  Defendants' Exhibits (Dkt. No. 35) Exh. 15-A. Accordingly, defendants are entitled to summary judgment dismissing the portion of plaintiff's ETS exposure claim based upon consideration of present injury suffered from that exposure.  *Contrast, e.g., Gill v. Smith,* 283 F. Supp. 2d 763, 769 (N.D.N.Y. 2003) (Scullin, C.J.) (summary judgment denied where defendant allegedly smoked in plaintiff's presence despite non-smoking policy and knowledge of plaintiff's asthmatic condition).

### (b)   Future Harm

Plaintiff's claim based upon future harm caused by exposure to ETS is governed by *Helling v. McKinney*, in which the Supreme Court squarely held that deliberately indifferent exposure of an inmate to levels of ETS which poses an unreasonable risk of serious damage to future health can run afoul of the Eighth Amendment's proscription on cruel and unusual punishment.  *Id.* at 35, 113 S. Ct. at 2481-82.  While distinctly similar to the analysis employed to evaluate claims alleging present harm, objective analysis of allegations of future harm based upon ETS exposure is slightly

more complicated, in that it involves two components.  As a threshold

matter, to prevail on such a claim plaintiff "must show that he [or she]. . . is

being exposed to unreasonably high levels of ETS."  509 U.S. at 35, 113

S. Ct. at 2482.   Additionally, as the *Helling* Court further explained,

> determining whether [plaintiff's] conditions of
> confinement violate the Eighth Amendment
> requires more than a scientific and statistical
> inquiry into the seriousness of the potential harm
> and the likelihood that such injury to health will
> actually be caused by exposure to ETS.  It also
> requires a court to assess whether society
> considers the risk that the prisoner complains of to
> be so grave that it violates contemporary standards
> of decency to expose *anyone* unwillingly to such a
> risk.  In other words, the prisoner must show that
> the risk of which he complains is not one that
> today's society chooses to tolerate.

*Id.* at 36, 113 S. Ct. at 2482 (emphasis in original).

In light of *Helling* plaintiff has failed to advance allegations of future

harm sufficient to satisfy the objective prong of the ETS exposure test.

While Liggins has alleged that he was exposed to ETS while at the HCJ,

he has submitted nothing concrete to establish that such circumstances

could result in harm to him; simply stated, plaintiff has failed to describe

conditions which rise to a level which today's society chooses not to

tolerate.  *See LaCroix v. Williams*, No. 97-CV-0790, 2000 WL 1375737, at

*2-3 (W.D.N.Y. Sept. 21, 2000) (no serious injury when plaintiff merely

44

alleged residence in a smoking dormitory and there was no objective medical evidence showing that plaintiff's symptoms were caused by exposure to ETS).  As the District of Columbia Circuit observed in *Scott v. District of Columbia*, *Helling* does not mandate smoke-free prisons. 139 F.3d 940, 942 (D.C. Cir.), *cert. denied sub nom.*, *Dawson v. District of Columbia*, 525 U.S. 851, 119 S. Ct. 125 (1998).  Accordingly, plaintiff's Eighth Amendment claims of exposure to ETS based upon a future harm theory lacks merit.

### 4.    Miscellaneous Prison Conditions

In addition to the claims already discussed, plaintiff's complaint contains a litany of grievances regarding the conditions to which he was exposed while confined in the HCJ.  Plaintiff complains, for example, of suffering verbal harassment at the hands of certain of the defendants, and of Sheriff Parker permitting such conduct.  *See*, *e.g.*, Amended Complaint (Dkt. No. 12) ¶ 21; Liggins Aff. (Dkt. No. 39) ¶ 6(bb).  Such allegations, however, are insufficient to establish a constitutional violation since, regardless of how boorish and reprehensible such conduct may appear, verbal harassment of inmates by prison officials generally does not arise to a level of constitutional significance.  *Chabazz v. Pico,* 994 F. Supp. 460, 474 (S.D.N.Y. 1998); *see also Gill v. Hoadley,* 261 F. Supp. 2d 113,

45

129 (N.D.N.Y. 2003).

In his complaint plaintiff also challenges the defendants' failure to establish a meaningful grievance procedure through which he and other inmates could seek redress of constitutional violations.  While the lack of such a procedure, or defendants' failure to properly administer it, might well provide a basis for excusing the plaintiff's failure to exhaust available administrative remedies as required under 42 U.S.C. § 1997e(a), *see Hargrove v. Riley*, No. CV-04-4587, 2007 WL 389003, at *8 (E.D.N.Y. Jan. 31, 2007), it does not independently establish a constitutional violation.[19] "Grievance procedures are the internal procedures and requirements of [prison officials], and, as such prison inmates [do not] have a constitutionally protected right to a grievance procedure . . . ." *Faison v. Hash,* No. 03-CV-6475P, 2004 WL 944523, at *3 (W.D.N.Y. Apr. 23, 2004) (citations omitted); *see also Adams v. Rice,* 40 F.3d 72, 75 (4th Cir. 1994) ("[T]he Constitution creates no entitlement to grievance procedures or

---

[19]    There is considerable question as to whether the plaintiff fulfilled his obligation to exhaust available, internal remedies in order to seek redress of his complaints as required under 42 U.S.C. § 1997e(a) before commencing this action.  In their motion defendants have not relied upon this procedural basis to seek dismissal of plaintiff's claims, perhaps owing to plaintiff's allegation that despite the existence of a grievance procedure he "was never permitted to use the procedure."  *See* Liggins Aff. (Dkt. No. 39) ¶ 6(gg).

access to any such procedure voluntarily established by a state.").  The plaintiff's allegations regarding the lack of a meaningful grievance procedure thus do not rise to a level of constitutional significance.

Plaintiff next complains regarding unsanitary conditions and practices at the HCJ, and in particular in connection with the preparation and service of food within the HCJ.  In his complaint and supporting affidavit, for example, plaintiff asserts claims associated with the food served to him while at the HCJ alleging, *inter alia,* that he "was served food with hair in it", was "served from an ink stained cup on several occasions" and that "eating utensils were unclean."  *See* Liggins Aff. (Dkt. No. 39) ¶¶ 6(kk), (mm), (nn); *see also* Amended Complaint (Dkt. No. 12) ¶¶ 66-72.  Defendants contest the sufficiency of plaintiff's allegations, both as lacking in factual support and, even if true, failing to rise to a level of constitutional significance.

Undeniably, the Eighth Amendment's prohibition of cruel and unusual punishment extends to the food provided to prison inmates. While the Eighth Amendment does not elevate to constitutional significance an inmate's dislike for the food served or the portions received, *see*, *e.g.*, *Word v. Croce*, 169 F. Supp. 2d 219, 226 (S.D.N.Y. 2001), it does require that prisoners be given "nutritionally adequate food

47

that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Ramos v. Lamm,* 639 F.2d 559, 570-71 (10th Cir. 1980) (citations omitted), *cert. denied*, 450 U.S. 1041, 101 S. Ct. 1759 (1981); *see also Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (citing *Lamm*); *Cunningham v. Jones,* 567 F.2d 653, 659-60 (6th Cir. 1977).

In their motion defendants assert that the food served to inmates within the HCJ is prepared by qualified and experienced individuals, with significant oversight by the New York State Department of Health.  Parker Aff. (Dkt. No. 33-3) ¶¶ 30-31.  Sheriff Parker's affidavit lists the identity and qualifications of the four individuals principally involved in food handling at the facility.  Sheriff Parker also specifically addresses plaintiff's  claims regarding a stained cup, explaining in his affidavit that an investigation into plaintiff's claims of discoloration of the beverage cup, attributed by Liggins to ink stains, revealed that the discoloration was due to exposure to hot temperatures in the facility dishwasher.  *See* Parker Aff. (Dkt. 33-3) ¶ 38; *see also* Defendants' Exhibits (Dkt. No. 34) Exh. 10-C.

Plaintiff's complaint and affidavit in opposition to defendants' motion are comprised largely of conclusory allegations regarding the food and unsanitary conditions under which it is served, without evidentiary support

48

or a great deal of specifics.  By contrast, in their motion defendants have provided substantial, detailed information regarding the food service practices at the facility and the standards under which it operates.  Since nothing in plaintiff's submissions reveals the existence of any condition associated with the preparation or service of food which would present immediate danger to the health and well-being of inmates at the HCJ, I conclude that no reasonable factfinder could find in plaintiff's favor on his Eighth Amendment claims associated with food service.

The balance of plaintiff's prison condition claims relate to minor matters, none of which, either singly or in combination, rise to a level sufficient to support a constitutional claim.  Plaintiff alleges, for example, that his civilian clothes and property were misplaced on two occasions. The record reveals, however, that in both instances the missing items were ultimately located, and no evidence has been adduced to reflect that their temporary misplacement was the result of intentional acts on the part of any of the defendants.[20] In any event plaintiff's claim for loss of property

---

[20]      As previously noted, personal involvement in a constitutional violation is a prerequisite to a finding of liability under 42 U.S.C. § 1983.  *See Wright*, 21 F.3d at 501.  Nothing in plaintiff's submissions identifies any of the particular defendants in this case as having been involved in the misplacement of plaintiff's clothes or, for that matter, in most of the incidents complained of, thus providing a independent basis for dismissal of plaintiff's claims. *See Barnes v. Henderson*, 490 F. Supp. 2d 313, 318-19 (W.D.N.Y. 2007).

does not lie in this instance in light of the fact that the State of New York

provides inmates with a remedy under section 9 of the New York Court of

Claims Act associated with such property losses.  *See Hudson v. Palmer,*

468 U.S. 517, 533, 104 S. Ct. 3194, 3203-04 (1983); *Gadson v. Goord*,

No. 96 Civ. 7544, 1997 WL 714878, at *7 (S.D.N.Y. Nov. 17,1997).

Plaintiff also apparently complains of the fact that while at the HCJ

he was not provided with an outside exercise area.  *See* Liggins Aff. (Dkt.

No. 39) ¶ 6(c).  Without question, prison officials must afford at least some

opportunity for exercise to prison inmates under the Eighth Amendment;

consequently, the Due Process Clause of the Fourteenth Amendment, at

a minimum, requires that some opportunity be provided.  *See Anderson v.*

*Coughlin,* 757 F.2d 33, 35 (2d Cir. 1985).  Cases addressing this

requirement do not, however, set forth specific parameters associated with

this requirement, instead leaving such matters to the sound discretion of

prison officials.  *See id.*; *see also Davidson v. Coughlin*, 968 F. Supp. 121,

130 (S.D.N.Y. 1997).  In determining whether a plaintiff's right to exercise

has been abridged, courts generally look to a number of factors, including

(1) the duration of the deprivation, (2) the extent of the deprivation, (3) the

availability of other out-of-cell activities, (4) the opportunity for in-cell

exercise, and (5) the justification for the deprivation.  *Davidson,* 968 F.

Supp. at 130 (citations omitted).  The provision of an hour of exercise daily

to prison inmates has been found to satisfy the minimum threshold

requirement under the Eighth Amendment.  *Anderson,* 757 F.2d at 35.

In this instance plaintiff was permitted to remain outside of his cell

and was freely allowed access to the entire jail facility each day between

the hours of 7:00 am and 11:00 pm.  Defendants' Exhibits (Dkt. No. 34)

Exh. 14 at pp. 132-34; Parker Aff. (Dkt. No. 33-3) ¶¶ 14-15.  While it is true

that inmates at the HCJ are not provided with an outdoor exercise area, in

light of practical constraints, they are free to exercise both in their cells

and anywhere else in the jail facility during the sixteen hours that they

were permitted to remain outside of their cells.  Accordingly, I find that no

reasonable factfinder could conclude that plaintiff's Eighth Amendment

rights were violated in this regard.

Plaintiff also complains of the failure of the defendants in several

respects to comply with regulations governing the operation of county jails

and penitentiaries, codified at 9 N.Y.C.R.R. §§ 7000-7103.  The violation

of a state law regulation, standing alone, however, does not arise to a

level of constitutional significance actionable under section 1983.  *See Ali*

*v. Timmons*, No. 04-CV-0164, 2004 WL 1698445, at *3 (W.D.N.Y. July 26,

2004) (citing *Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir.), *cert. denied*,

51

484 U.S. 896, 108 S. Ct. 229 (1987)).

In sum, while plainly not portraying conditions which could be described as exceedingly pleasant, none of plaintiff's allegations describe circumstances from which a reasonable factfinder could discern the existence of actual or imminent substantial harm sufficient to establish the violation of the Due Process Clause of the Fourteenth Amendment.  I therefore recommend the entry of summary judgment dismissing plaintiff's prison condition claims as a matter of law.

IV.    <u>SUMMARY AND RECOMMENDATION</u>

Plaintiff's complaint, which recounts varied grievances regarding his nine month detention within the HCJ, includes an amalgamation of claims principally implicating his right to substantive Due Process under the Fourteenth Amendment United States Constitution.  The HCJ, as portrayed by the plaintiff, is anything but a model prison.  It may well be that with judicial oversight, many of the practices of which Liggins has complained could be rectified.  The Supreme Court long ago sagely counseled against such judicial intervention, however, in its decision in *Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861 (1979), observing that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions", falling within the ambit and expertise of

corrections officials and requiring that "[p]rison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  *Bell,* 441 U.S. at 547, 99 S. Ct. at 1878 (citations omitted).  For these reasons the Supreme Court has urged courts to resist the impulse to become "enmeshed in the minutiae of prison operations", noting that

> under the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan.  This does not mean that constitutional rights are not to be scrupulously observed.  It does mean, however, that the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution or, in the case of a federal prison, a statute.  The wide range of "judgment calls" that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.

*Id.* at 562, 99 S. Ct. at 1886.

Based upon a careful review of the record before the court, considered in a light most favorable to him, I find that none of the matters complained of rise to a level of constitutional significance and could lead to a finding by a reasonable factfinder that plaintiff's constitutional rights

53

have been violated.[21]  Accordingly, it is hereby

RECOMMENDED that defendants' motion for summary judgment

(Dkt. No. 33) be GRANTED, and that plaintiff's complaint be DISMISSED

in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within

which to file written objections to the foregoing report.  Such objections

shall be filed with the Clerk of the Court.  FAILURE TO OBJECT TO THIS

REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roldan v. Racette*,

984 F.2d 85 (2d Cir. 1993).

---

[21]     In light of my recommendation on the merits I have not addressed
defendants' additional arguments, including to the effect that plaintiff's failure to
establish a physical injury deprives him of the right to recover damages for mental
anguish and emotional distress in this action under 42 U.S.C. § 1997e(e), as well as
their claim of entitlement to qualified immunity from suit.

It is further ORDERED that the Clerk of the Court serve a copy of
this report and recommendation upon the parties in accordance with this
court's local rules.


Dated:      September 5, 2007
            Syracuse, NY




_____
David E. Peebles
U.S. Magistrate Judge